**Fourth Circuit Docket No. 13-2014**

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

**DANA WEST, et al., Plaintiffs-Appellants**

**v.**

**SUSAN MURPHY, et al., Defendants-Appellees**

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND AT BALTIMORE**
**(The Honorable Catherine C. Blake)**

**APPELLANTS' OPENING BRIEF**

Barrett S. Litt
234 East Colorado Boulevard, Suite 230
Pasadena, California 91101
Phone: (626) 844-7660
Fax: (626) 844-7670
E-mail: blitt@kmbllaw.com

Sean R. Day
7500 Greenway Center Drive, Suite 110
Greenbelt, Maryland 10770
Phone: (301) 220-270
Fax: (301-220-2441
E-mail: sean@dayincourt.net

William Claiborne
2020 Pennsylvania Avenue, NW, #395
Washington, D.C. 20006
Phone: (202) 824-0700
E-mail; claibornelaw@gmail.com


Attorneys for Plaintiffs-Appellants

Matthew J. Fader
Office of the Attorney General
Of Maryland
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Phone: (410) 576-7906
Fax: (410) 576-6955
E-mail: mfader@oag.state.md.us

William F. Brockman
Office of the Attorney General
Of Maryland
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Phone: (410) 576-7906
Fax: (410) 576-6955
E-mail: wbrockman@oag.state.md.us

Attorneys for Defendants-Appellees

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. _____     Caption: _____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_____
(name of party/amicus)

_____

who is _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      YES      NO

2.      Does party/amicus have any parent corporations?                              YES      NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                      YES      NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      YES      NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      YES      NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      YES      NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____

Counsel for: _____

## CERTIFICATE OF SERVICE

**************************

I certify that on _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____                  _____
(signature)                                       (date)

**TABLE OF CONTENTS**

I.   JURISDICTIONAL STATEMENT……………………….……………..… 1

II.  STATEMENT OF ISSUES…………………………………………… 1

III. STATEMENT OF THE CASE……………………….…………………….. 3

IV. STATEMENT OF FACTS……………………………………………… 6

    A. THE BOOKING FLOOR ................................................................ 6
      1.  Strip Searching Persons Likely To Be Released ................................... 6
      2.  Central Booking And The Booking Floor ............................................. 8
      3.  How Arrestees Move Through The Booking Floor ......................... 10
      4.  The Booking Floor Did Not Have A General Population .................. 12
      5.  Arrestees Were Continuously Monitored At Hearings And
         Post-Hearings ............................................................................. 16

    B. STRIP SEARCHES ..................................................................... 17
      1.  Strip Search Policy........................................................................ 17
      2.  Change In Strip Search Policy .................................................... 18
      3.  Practice Of Strip Searching All Arrestees ......................................... 20
      4.  Example of Strip Searches ................................................. 20

V.  SUMMARY OF ARGUMENT. ................................................. 21

VI.  THE DISTRICT COURT ERRED IN CONCLUDING THAT
    DEFENDANTS HAD QUALIFIED IMMUNITY BECAUSE FEDERAL
    STRIP SEARCH LAW IS CURRENTLY "UNCLEAR." ......................... 24

    A. The Court Below Made Its Clearly Established Determination Based
      On The State Of The Law At The Time Of The Ruling, Not At The
      Time Of The Challenged Conduct.......................................................... 24

B. The Qualified Immunity Framework. ....................................................... 27
   1. Clearly Established Law Is Ordinarily Based On Supreme Court
     Or Circuit Precedent........................................................................... 27
   2. Clearly Established Law Looks To The State Of The Law At The
     Time Of The Events........................................................................... 28

C. The Law Was Clearly Established In This Circuit During The Relevant
   Period That Strip Searches Of New Arrestees On Minor Charges Not
   Placed In The General Population Were Unconstitutional. ....................36

D. The Supreme Court's Decision In Florence Was Expressly Limited To
   Those Entering The "General Population" And Did Not Affect The
   Controlling Effect Of Logan. .................................................................. 40

E. Logan Is Correct And Is Supported By A Close Reading Of Florence.... 41

VII.  CONCLUSION…………………….. ................................................................... 55

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Abshire v. Walls*
    830 F.2d 1277 (4th Cir.1987) ....................................................................25, 37

*Alexander v. Sandoval*
    532 U.S. 275, 121 S.Ct. 1511 (2001)................................................................45

*Amaechi v. West*
    237 F.3d 356 (4th Cir.2001) ...................................................................25, 37, 42

*Atwater v. City of Lago Vista*
    532 U.S. 318 (2001)...................................................................24, 47, 48, 49, 50

*Bell v. Wolfish*
    441 U.S. 520, 99 S.Ct. 1861 (1979)...................................................36, 41, 42, 51

*Bennett v. R & L Carriers*
    2012 WL 2354633 (4th Cir. 2012) ....................................................................38

*Blackburn v. Snow*
    771 F.2d 556 (1st Cir. 1985)..............................................................................42

*Block v. Rutherford*
    468 U.S. 576 (U.S. 1984)...........................................................................12, 14

*Brosseau v. Haugen*
    543 U.S. 194, 125 S. Ct. 596 (2004)....................................................22, 23, 29, 32

*Bull v. City & Cnty. of San Francisco*
    595 F.3d 964 (9th Cir. 2010) ...........................................................13, 24, 39, 54

*Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*
    2013 WL 2389447 (S.D.W.Va. May 30, 2013) .................................................46

*Cianfaglione v. Rogers*
    2012 WL 1659141 (C.D.Ill. May 11, 2012) .....................................................39

*County of Riverside v. McLaughlin*
    500 U.S. 44 (U.S. 1991)............................................................................44, 48

*Davis v. Scherer*
  468 U.S. 183, 104 S. Ct. 3012 (1984)...........................................................22, 29

*Doe ex rel. Johnson v. S. Carolina Dep't of Soc. Servs.*
  597 F.3d 163 (4th Cir. 2010) ................................................................27, 28, 30

*Doe v. Renfrow*
  631 F.2d 91 (7th Cir.1980) (*per curiam*)...........................................................42

*Ellsworth v. Wachtel*
  No. 1:11–CV–0381, 2013 WL 140342 (N.D.N.Y. 2013) ...................................54

*Evans v. Stephens*
  407 F.3d 1272 (11th Cir.2005) (*en banc*)..........................................................35

*Flonder v. Sheriff of Kankakee County*
  No. 12–2115, 2012 WL 4321714 (C.D.Ill. 2012) ..............................................55

*Florence v. Board of Chosen Freeholders of County of Burlington*
  132 S. Ct. 1510 (2012)…………………... 1, 2, 5, 13, 21, 22, 23, 24, 25, 26, 27,
  ............................. 33, 36, 38, 39, 40, 41, 43, 44, 46, 47, 48, 49, 50, 51, 52, 54, 55

*Gerstein v. Pugh*
  420 U.S. 103 (U.S. 1975)..............................................................................44, 49

*Harlow v. Fitzgerald*
  457 U.S. 800, 102 S.Ct. 2727 (1982)..................................................................29

*Henson v. Liggett Grp., Inc.*
  61 F.3d 270 (4th Cir. 1995) ................................................................................38

*Hill v. Crum*
  727 F.3d 312 (4th Cir. 2013) ..................................................................30, 31, 32

*Holland v. City of San Francisco*
  C10-2603 TEH, 2013 WL 968295 (N.D.Cal. 2013) ..........................................54

*Hudson v. McMillian*
  503 U.S. 1, 112 S.Ct. 995 (1992)..................................................................30, 31

*Hunter v. Auger*
  672 F.2d 668 (8th Cir.1982) ...............................................................................42

*Johnson v. United States*
  333 U.S. 10 (1948)...............................................................................49

*Jones v. Murphy*
  2013 WL 822372 (D. Md. 2013) ...........................................14, 22, 26

*Jones v. Murphy*
  470 F.Supp.2d 537 (D.Md.2007)........................................................25

*Kennedy v. Los Angeles Police Dep't*
  901 F.2d 702 (9th Cir.1990) ...............................................42, 43, 44

*League of United Latin Am. Citizens v. Perry*
  548 U.S. 399, 126 S.Ct. 2594 (2006)................................................45

*Lefemine v. Wideman*
  672 F.3d 292 (4th Cir.2012), vacated on other grounds, —— U.S. ——,
  133 S.Ct. 9, 184 L.Ed.2d 313 (2012)................................................28

*Logan v. Shealy*
  660 F.2d 1007 (4th Cir.1981) ....................................................passim

*Maryland v. King*
  133 S.Ct. 1958 (2013)..................................................................53, 54

*McMellon v. United States*
  387 F.3d 329 (4th Cir. 2004) (*en banc*) ............................................39

*Meyers v. Baltimore Cnty., Md.*
  713 F.3d 723 (4th Cir.2013) ..............................................................29

*Missouri v. McNeely*
  133 S.Ct. 1552 (2013)..................................................................52, 53

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*
  460 U.S. 1, 103 S.Ct. 927 (1983).....................................................45

*Munyiri v. Maynard*
  CIV. CCB-08-1953, 2013 WL 1325223 (D. Md. 2013) ..............26, 27

*Pearson v. Callahan*
  555 U.S. 223, 129 S.Ct. 808 (2009)..................................................30

*Powell v. Barrett*
    496 F.3d 1288 (11th Cir. 2007) ........................................................33, 34, 35, 39

*Safford Unified Sch. Dist. No. 1 v. Redding*
    557 U.S. 364, 129 S.Ct. 2633 ..............................................................42, 51, 53

*Schmerber v. California*
    384 U.S. 757 (1966)..............................................................................................52

*Smith v. Montgomery County*
    547 F.Supp. 592 (D.Md. 1982)..........................................................................46

*T.S. v. Gabbard*
    2012 WL 2175791 (E.D.Ky. 2012) ..................................................................36

*Turner v. Safley*
    482 U.S. 78, 107 S.Ct. 2254 (1987).................................................................41

*Waters v. Churchill*
    511 U.S. 661, 114 S.Ct. 1878 (1994) ..............................................................45

*Wilkins v. Gaddy*
    559 U.S. 34, 130 S.Ct. 1175 (2010)......................................................30, 31, 32

*Wilson v. Layne*
    526 U.S. 603, 119 S. Ct. 1692 (1999)....................................................27, 28, 35

### FEDERAL STATUTES

28 U.S.C. §1291 ....................................................................................................1

28 U.S.C. §1331 ....................................................................................................1

28 U.S.C. §1343(a)(3)...........................................................................................1

### RULES

Rule 12(b)(6).....................................................................................................3, 4

Rule 23(b)(3).........................................................................................................4

Rule 54(b)..........................................................................................................4, 5

## CONSTITUTIONAL PROVISIONS

Eighth Amendment ..................................................................30

Fourth Amendment ...........................................2, 25, 36, 49, 52, 54

**OTHER AUTHORITIES**

Erica Goode, "Many in U.S. Are Arrested by Age 23, Study Finds", N.Y. Times, Dec. 19, 2011 ...........................................................50

http://www.washingtonpost.com/local/crime/14-more-correctional-officers-charged-in-maryland-detention-facilities-case/2013/11/21/0af0e55c-52d1-11e3-9fe0-fd2ca728e67c_story.html........................................14

## I. JURISDICTIONAL STATEMENT

The district court had original jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291 (appeal from final judgment). Judgment was entered on July 31, 2013, 2013. [JA4274-4275] Notice of Appeal was filed on August 12, 2013, 2013. [JA4276]

## II. STATEMENT OF ISSUES

In *Florence v. Board of Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510 (2012), the Supreme Court ruled narrowly that a jail may strip search an arrestee without reasonable suspicion before admitting him/her into general population, provided that he was arrested on a warrant, the charges were reviewed by a neutral magistrate, and there was no alternative to holding him in general population. [*Id*. at 1523] Two Justices wrote separately to emphasize the limits of the decision. Four Justices dissented. The combined dissent and concurrences establish, or at least strongly suggest, that – consistent with this Court's holding in *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir.1981)) – those arrested on minor charges, held in an area separate from the general jail population and who have not yet appeared before a judicial officer, may not be strip searched.

Appellants here were arrested for minor offenses and strip searched without reasonable suspicion before a neutral magistrate reviewed the charges against

1

them, although they were held in an area separate and apart from the general population. The District Court ruled that, although *Florence* was decided long after the events that are the subject of this suit, *Florence* nonetheless meant that the strip search law in this Circuit was not clearly established before *Florence* was decided (or even was the subject of a cert petition), even though *Logan* was the controlling law in the Circuit at the time of the events. On this basis, the Court granted Defendants summary judgment on qualified immunity grounds. As a result, the Court never reached the constitutionality of the searches (the second prong of the qualified immunity analysis).

The issues presented on this appeal are:

1.    Whether the Fourth Amendment permits the strip search of a person arrested on a minor charge, who is held in an area separate and apart from the general population in a temporary holding area assigned for that sole purpose, before a magistrate has yet reviewed the charges against him/her and where there is no reasonable suspicion that the person is in possession, of drugs, weapons or any other contraband,

2.    Whether, in light of *Florence*, the law regarding strip searches of new arrestees on minor charges not placed or assigned to the general population was not clearly established in 2002-2004 in this Circuit despite the fact that Circuit law was clear at the time that such searches were unconstitutional

and even though officials had notice of their unconstitutionality at the time they engaged in the strip searches at issue.

## III.   STATEMENT OF THE CASE

The Plaintiffs filed a class action complaint (Doc. 1) on May 12, 2005, against the then-current warden Susan Murphy, in her individual and official capacities, and the predecessor warden William Jednorski of the Baltimore Central Booking and Intake Center ("BCBIC," commonly referred to locally as "Central Booking"), the Mayor & City Council of Baltimore ("City"), and the Baltimore City Police Department ("BPD").

The Complaint alleged the policy and/or custom of arresting persons in the City of Baltimore and taking them the BCBIC for booking, processing, and presentment. The Defendant wardens were policymakers and supervisors responsible for policies and customs of strip searching arrestees before presentment without reasonable suspicion; of strip searching men in a non-private setting; and of detaining arrestees for more than 48 hours without presentment to a judicial officer. The claims against the City and BPD were under an "entrustment" theory of liability dismissed on Jan. 4, 2007 under Rule 12(b)(6) (Doc. 93).

As most recently amended, the Fourth Amended Complaint [JA35-119] contained 12 counts:

| Count | Nature | Certified as Class? | Status |
|---|---|---|---|
| 1 | Suspicionless Strip Search | Yes | On Appeal (Rule 54(b)) |
| 2 | Non-Private Strip Search | No | Pending in District Court |
| 3 | Equal Protection Strip Search | No | Dismissed Voluntarily as to all Plaintiffs except Jones (Doc. 465, 4/25/13), Dismissed by Order as to Jones (Doc. 471, 5/23/13) |
| 4 | Overdetention | Yes | Pending in District Court |
| 5-8 | Same as 1-4 but against City and BPD for Entrustment Liability | No | Dismissed per Rule 12(b)(6) (Doc. 93, 1/4/07) |
| 9 | Plaintiff Jones's individual overdetention claim | No | Dismissed by Order (Doc. 471, 5/23/13) |
| 10 | Plaintiff Jones's individual overdetention claim against City and BPD | No | Dismissed per Rule 12(b)(6) (Doc. 93, 1/4/07) |
| 11 | Equal Protection Search to Underwear | No | Dismissed Voluntarily (Doc. 465, 4/25/13), |
| 12 | Equal Protection Search to Underwear against City and BPD | No | Dismissed per Rule 12(b)(6) (Doc. 93, 1/4/07) |

On March 19, 2009, the district court certified Counts 1 and 4 as Rule

23(b)(3) classes, and denied certification of Counts 3 and 11. Certification was not

sought as to Count 3 which, by that time, Plaintiffs had abandoned though not

formally dismissed until 4/25/13.

Plaintiffs appealed the denial of certification on Counts 2 and 11 (Case No.

09-150), and Defendants appealed the granting of certification on Counts 1 and 4

4

(No. 09-149). On May 28, 2009, this Court denied both petitions (Doc. 15 in 09-149).

On January 14, 2011, Defendants Murphy[1] and Jednorski moved for summary judgment on Count 1 [JA3296-3326, JA3327-3410].[2] A decision on the motions was deferred pending a decision in *Florence v. Bd. of Chosen Freeholders*, 132 S.Ct. 1510 (April 2, 2012), followed by several supplements by the parties as additional lower level decisions were issued.

On March 5, 2013, the district court (Blake, J.) granted the motions for summary judgment on Count 1 [JA4263-4272, JA4273].

On May 24, 2013, after streamlining the litigation as shown on the above chart describing claims, Plaintiffs moved for a Rule 54(b) judgment on Count 1 (Doc. 472). On July 31, 2013, the district court granted the motion and entered a Rule 54(b) judgment. [JA4274-4275]

The Plaintiffs filed a notice of appeal on August 12, 2013 [JA4276].

---

[1] A subsequent warden, Mitchell Franks, was added to the case, but dismissed as a Defendant by stipulation (approved at Doc. 466, 4/25/13).

[2] Ms. Murphy separately moved for summary judgment on Count 4 (Doc. 392, 1/31/11) (pending). Earlier, Plaintiffs conceded a motion to shorten the time period for this class since discovery revealed that detentions of more than 48 hours were an issue only during Ms. Murphy's tenure as warden (Doc. 374).

## IV.   STATEMENT OF FACTS

### A.   THE BOOKING FLOOR

#### 1.   Strip Searching Persons Likely To Be Released

Defendants William Jednorski and Susan Murphy were the two sequential wardens of the Central Booking and Intake Center ("Central Booking") during the class period.[3] [JA3327-3410, see pp.3343-3344] Murphy was assistant warden during Jednorski's tenure and then became warden. [*Id*., at p.3341]. During that time, they implemented an official policy and practice of subjecting all arrestees brought to the separate and self-contained "booking floor" of Central Booking for processing and presentment to blanket strip/squat search in a non-private room for the male arrestees. This occurred even though the great majority of the arrestees would be released from the booking floor before or at presentment. [JA202-205] Although Defendant Murphy officially ended the policy in about 2004, the practice of strip-searches nonetheless continued.

---

[3] The class period starts May 12, 2002. Defendant Jednorski was warden from the start of the class period (May 12, 2002) through March 8, 2004. He actually started as warden of Central Booking in 1998. Susan Murphy was acting warden of Central Booking from March 9, 2004 through June 22, 2004 when she became warden. [JA3327-3410, see p.3344] Her tenure ended on June 22, 2005. [*Id.* at pp.3343-3344]  Plaintiffs have argued that Defendant Murphy's liability for the injuries caused by her customs and policies continues past her separation date, and that it is a question of fact whether she is liable after her separation date (with an outside date of 4/30/08).

Viewing the evidence in the light most favorable to Plaintiffs, and accepting the credibility of Plaintiffs' evidence, there was a policy and/or widespread pattern and practice of:

➢ strip searching **male** arrestees throughout

   (a) Mr. Jednorski's tenure as warden;

   (b) Ms. Murphy's tenure as assistant warden for booking; and

   (c) into the beginning of Ms. Murphy's tenure as warden; and

➢ strip searching **female** arrestees throughout

   (a) Mr. Jednorski's tenure as warden; and

   (b) Ms. Murphy's tenure as assistant warden for booking; and

   (c) continuing as a practice throughout (and past) Ms. Murphy's tenure as warden.

Plaintiffs in this case are pre-presentment arrestees arrested on minor charges brought to the booking floor of Central Booking for booking. As used herein, an "arrestee" is a person arrested and brought to the booking floor for identification and booking, but not yet presented to a commissioner for a combined probable cause/ bail hearing, as opposed to a "detainee," who is a person denied pretrial release and held in one of the housing floors pending trial. "An arrestee would be one on the booking floor, and a detainee is one that has been committed." [JA2258-2590, see p.2292]

7

The arrestees were either released without charge directly from the booking floor, or presented to a commissioner for a combined probable cause/bail hearing. They never mingled with any inmates of the general population housing floors of Central Booking unless and until they were ordered held at the probable cause/bail hearing. After arrestees were presented to a commissioner, they were not intermingled with arrestees still awaiting presentment, whether the commissioner had ordered them released or remanded them to be housed in general population. See discussion and cites below.

### 2.     Central Booking And The Booking Floor

Law enforcement officers who make arrests in the City of Baltimore take arrestees directly to the "booking floor" of Central Booking for identification and booking, and other intake and booking functions before the arrestees are either released or committed to the detention areas of Central Booking. [JA3327-3410, see p.3342] Central Booking consists of two distinct areas: (1) the booking area on the second floor (the "booking floor"); and (2) the housing areas on the higher floors. [JA2837-3018; JA3327-3410, see p.3342; JA2042-2093, see p.2047]

The booking floor is a booking and intake area sealed off from the housing areas of the facility for persons committed at the probable cause/bail hearing. [JA3327-3410] The booking floor is a separate floor of the CBIC and is dedicated to processing arrestees prior to presentment (a probable cause and release hearing)

or release without charge. Persons awaiting presentment or release without charge are held separately from persons who are committed to general population pending trial. There is no commingling between arrestees on the booking floor and pretrial detainees or other inmates held on the separate general population housing floors. [*Id.,* JA2591-2779, see pp.2605-2614; JA2789-2805, see p.2790; JA2042-2093, see pp.2047, 2057] The booking floor is **not** inside the county jail. Arrestees on the booking floor do **not** intermingle with jail inmates or inmates on other floors unless and until they are committed into the jail's general population after being ordered held in a probable cause/bail hearing on the booking floor. The housing area, which is not at issue in this litigation, makes up the third, fourth and fifth floors at Central Booking, and houses male pretrial detainees who have already been presented to a court commissioner or other judicial officer and ordered held pending trial. [*Id.*]

The booking floor handles the booking functions formerly conducted at various police stations in the Baltimore metropolitan area. [JA3327-3410, see p.3341; JA237-255, see p.242] The booking floor function is only for processing arrestees for fingerprinting and identification, and entering their biographical and charge data into the Automated Booking System (or "ABS," Central Booking's computerized booking and inmate management system), so that prosecutors can evaluate their cases and make decisions about whether to decline or recommend

prosecution. The arrestees are released without charges if the prosecutor declines to prosecute, or are presented to commissioners for probable cause determinations and bail hearings if the prosecutor decides to prosecute. [JA2780-2805, see p.2790]

### 3.    How Arrestees Move Through The Booking Floor

The Plan for Efficient and Timely Processing on the Booking Floor prepared by Central Booking has flowcharts showing how arrestees progressed through the stations of the booking floor. [JA237-255, see p.251] Each arrestee arrived at Central Booking having already been processed by the arresting officer with his name, charge, and arresting agency remotely entered into ABS by the arresting officer at the police station. [JA2114-2217, see p.2163] Each arrestee wore a "toe tag," [*Id*.], *i.e.*, a wristband with a bar code, name, and arrest charge, or sometimes a piece of paper if the arrestee did not have a wristband. [*Id*.] Arrestees were thoroughly patted down at the sallyport, and passed through metal detectors when they entered the booking floor. [JA2258-2590, see p.2403] They were then strip searched in a search room. [JA2806-2807]

The booking floor is not even a "holding area." [JA2780-2805, see p.2790] Arrestees moved quickly through the stations (*e.g.,* sallyport entry, search room, fingerprinting, and identification) on the booking floor, pausing at each one only as long as it took to complete that function before moving on to the next station. [JA237-255, see p.251] Arrestees wore "flex-cuffs" while on the booking floor,

and they were escorted at all times by "escort officers" as they moved through the stations of the booking floor. [JA2837-3018, see p.2977]

Arrestees were there "temporary, not for long." After they had passed through all the stations and been processed, they waited in "holding rooms", not holding "cells." [*id*. at p.2975] The holding rooms had benches, [*Id*. at p.2974] locked doors, [*id*. at p.2976], and plexi-glass windows so the guards could look in and observe the arrestees. [*Id*.] They did not have bars, so nothing could be passed out from the rooms to the outside. [*Id*. at p.2974] The rooms did not have beds for overnight stays. [*Id*. at pp.2975, 2976] "They're holding rooms, and they're supposed to be there for temporary, not for long." [*Id*. at p.2975] Persons that booking floor staff considered security risks were segregated and placed in a "couple [separate] rooms". [*Id*. at p.2976]

Former Central Booking Commissioner Flanagan said it was not a security issue to place arrestees into the holding rooms without strip searches because the police conducted searches; sallyport officers conducted pat downs, and there were metal detectors at the door. [*Id*. at pp.2977, 2978] According to Defendants Jednorski and Murphy, virtually 100% of arrestees received on the booking floor were moved out of Central Booking within 24 hours. [JA2591-2779, see pp.2623, 2624; JA2258-2590, see p.2309] During Commissioner Flanagan's tenure, persons held for 24 hours who had not yet seen a commissioner were simply released.

11

[*Id*. at p.2314] In fact, the former security chief of Central Booking conceded that the arrestees "are not on the booking floor that long to really have a security issue. . . ." [JA2094-2101, see p.2099; see also JA2591-2779, see p.2667] (agreeing that strip searches were not "necessary to preserve the security on the booking floor").[4]

### 4.    The Booking Floor Did Not Have A General Population

The booking floor did not meet the accepted description of a "detention facility," which is generally understood to be a facility that houses pretrial detainees held without bail (or held on bail they cannot meet) pending trial, persons who have been sentenced and have appealed, persons serving short sentences, and certain other types of prisoners. *Block v. Rutherford*, 468 U.S. 576, 587 (U.S. 1984).

Defendants agreed that the Plaintiff Class, composed only of those who never moved from the booking floor to another part of the jail, were not part of the general population. The booking floor **does not** have a general population, and arrestees are at all times detained in holding rooms. [JA2258-2590, see pp.2315, 2316-2318; JA2780-2805, see pp.2792, 2793; JA2837-3018, see pp.2882, 2974] The booking floor did not have the other attributes of a general population where

---

[4] Warden Jednorski expressed this opinion in the context of denying that strip searches were conducted. The existence of a custom and practice of strip searches on the booking floor is a disputed issue of fact. Jednorski denies the practice but both Flanagan, [JA2806-2807, see ¶3], and Murphy concede it, [JA2258-2590, see pp.2429, 2430], though Murphy contends the practice ended in about 2001 or 2002. [*Id*. at pp.2462-2463]

inmates live for varying, often lengthy, periods of time in cells in housing units.

The holding rooms on the booking floor did not have beds for overnight stays. [*Id.* at pp.2975, 2976] On the booking floor, inmates are not free to leave the cells in the daytime and they do not intermingle with guards and other inmates in common rooms and other places such as exercise yards, infirmaries and libraries. Moreover, unlike general population inmates in a "detention facility," arrestees at the booking floor did not have contact visits with persons from outside the facility. Nor did other outsiders such as vendors and delivery people have access to the booking floor. [JA2258-2590, see pp.2316-2318] On the booking floor, arrestees were only at their stations a short period of time, so they did not form relationships with correctional officers similar to what occurs in a general population setting. [*Id.* at pp.2317-2318][5] See "14 More Corrections Officers Charged In Baltimore

---

[5] The term "general population" generally refers to those placed in housing for an indeterminate or fixed stay. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1520 (2012) ("There is a substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who *live or work* at these institutions at even greater risk when he is admitted to the general population.") (emphasis supplied); *Bull v. City & Cnty. of San Francisco,* 595 F.3d 964, 982 (9th Cir. 2010) ("San Francisco's policy requiring strip searches of all arrestees *classified for custodial housing* in the general population was facially reasonable") (emphasis supplied). The general population is distinguished from those, like the Plaintiffs here, who are held in separate holding cells without beds. *Bull, supra* at 698 (San Francisco had "a temporary intake facility equipped with holding cells but no beds" in which inmates were held to see if they would be released, and those arrestees were not strip searched; arrestees not released from the temporary intake facility were "transported to a jail with housing facilities" and were strip searched at that time).

Corruption Probe Involving Jail Gang,"

http://www.washingtonpost.com/local/crime/14-more-correctional-officers-charged-in-maryland-detention-facilities-case/2013/11/21/0af0e55c-52d1-11e3-9fe0-fd2ca728e67c_story.html.

The Court below agreed that the inmates at issue here were not admitted into the "general population." [JA 4263-4272, see p.4270] *Jones v. Murphy*, 2013 WL 822372 *1 (D. Md. Mar. 5, 2013) ("Arrestees do not enter a 'general population' after the initial search during the booking process. [JA2258-2590, see pp.2315-2316] Once an arrestee has appeared before a commissioner, he is either released or committed to the housing area on floors three, four, and five of Central Booking, i.e. general population. [*Id.* at p.2316; JA2780-2805, see p.2791]

The difference in the security risk between a temporary holding cell and the general population is reflected in the fact that, as is typically the case, the Baltimore general population inmates had contact visitors, which were not available to those in the holding cells. [JA3075-3100] Contact visits are generally considered to pose a significant security risk. See *Block v. Rutherford*, 468 U.S. 576, 586-587 (1984) ("Contact visits invite a host of security problems. They open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and

14

pass them to an inmate unnoticed by even the most vigilant observers.");

"Reducing Drugs And Alcohol In Prisons" By John M. Vanyur[6], Ph.D. And J.T.

O'Brien [JA176-180, see p.177]

Most warrantless arrestees for minor charges were **released directly from the booking floor without ever being placed into the housing floors of Central Booking**. For example, 75% of the **warrantless** arrests on charges **not involving drugs, weapons, or felony violence** (i.e., potential class members of the **warrantless** arrests) were released directly from the booking floor. [JA3411-3414, see p.3413 (chart, 78,355/185,546 (42.2%) and 62,165/185,546 (35.5%).)] In fact, about **42% got released without charge ("RWOC[7]") without even going to a probable cause hearing**, and another **33.5% get released on their own recognizance** at their hearings. Meanwhile, of all **warrant** arrests, 14.5% were released on their own recognizance directly from the booking floor.[8] [*Id.*, at

---

[6] At the time of the article Mr. Vanyur was senior deputy assistant director of corrections programs for the Federal Bureau of Prisons and J.T. O'Brien was warden of the U.S. Penitentiary in Atwater, CA.

[7] Many of the RWOCS are arrested as part of the City's program of administering "handcuff therapy" to poor minorities, and everyone knows they will be released. [JA2258-2590, see p.2508] "Handcuff therapy" is the City's practice of arresting persons without an intent to charge them in order to deter future conduct. *Id*.

[8] Determining this percentage for just those warrant arrests *not* involving drugs, weapons, or felony violence would require sampling that has not been performed;

p.3414] Approximately 100% of arrestees received on the booking floor got released from Central Booking within 24 hours. [JA2591-2779, see pp.2623-2624; JA2258-2590, see p.2309]

### 5.    Arrestees Were Continuously Monitored At Hearings And Post-Hearings

When arrestees saw the court commissioners, they were escorted, held in flexicuffs, and separated from the commissioners by Plexiglass. [JA2837-3018, see p.2977] Court commissioners were "very well protected" behind Plexiglass. [*Id.*]

Women who had seen a commissioner and were ordered detained were segregated from other female arrestees on the booking floor, then taken to a separate facility (the Women's Detention Center). [JA2591-2779, see pp.2612-2614] While awaiting transfer after seeing a commissioner, they were in separate cells separated by a brick wall from those waiting to see a commissioner. [*Id.*]

Men who had seen the commissioner were also segregated from men still waiting to see a commissioner, and likewise followed different paths depending on whether they were being held or released. [JA2042-2093, see p.2057]

Post-commissioner men who were committed to the general population on the housing areas at Central Booking were strip searched as they left the booking floor and entered the housing areas: "Males who are committed by a court

---

however, the percentage of warrant arrestees released on their own recognizance would logically be higher for those with minor charges.

commissioner go through an additional intake process, including being required to strip naked and shower, and are transferred to the housing area." [JA3327-3410, see pp.3342-3343]

There was no intermingling between arrestees being booked and persons detained in the general population. While some persons in the general population might go through the booking floor to be booked on a charge for which they were not already being held, they were fully strip searched before being placed back into the general population. [JA1598-1629, see pp.1608-1610]

Former Security Chief (2004-2006) and Assistant Warden (2006-2008) Otis Merritt acknowledged that the booking floor did not have the same security concerns as the floors with a general population, stating, "**So, the detainees are not on the booking floor that long to really have a security issue**. . . ." [JA2094-2101, see p.2099]  Defendant Jednorski agreed that blanket strip searching was not necessary for booking floor security. [JA2591-2779, see p.2667]

### B.   STRIP SEARCHES

#### 1.   Strip Search Policy

When Central Booking opened in 1995, LaMont Flanagan, then Commissioner for the Maryland Division of Pretrial Detention and Services from prior to the opening of the BCBIC until May 2003, instituted a written policy of subjecting all arrestees to blanket strip searches upon admission to the booking

17

floor. [JA2806-2807, see ¶3] This policy continued until after former Commissioner Flanagan left in May 2003. [*Id.*, see ¶1] By strip search, former Commissioner Flanagan meant "having all incoming arrestees, regardless of charge, remove and/or pull down their clothing and squat to allow visual inspection of bare genital, buttock, and breast areas, to ensure that the arrestees were not concealing contraband in their buttocks, genital areas, or (for women) breasts." [*Id.* at ¶3] Both wardens Jednorski and Murphy knew about the strip search policy and practice, and both condoned and enforced it. [*Id.* at ¶¶6, 7]

It appears that new or revised post orders were issued for male and female search rooms on November 16, 1998, because they were referenced in the August 2004 post issued by Defendant Murphy. [JA228-229; JA230-232] But, neither of the Defendants nor Central Booking was able to produce an authenticated copy of any 1998 post orders that were continuously in the custody of either Defendant or Central Booking. [JA2249-2252; JA2253-2257, see Nos. 5, 6]

## 2.    Change In Strip Search Policy

Defendant Jednorski continued the policy of subjecting all arrestees to blanket strip searches through the end of his tenure as warden in about 2004. That policy remained in effect until the next uncontested change in policy, August 20, 2004, when (what appears to be) the 1998 post orders were revised after Susan Murphy became warden. [JA228-229; JA230-232]

18

Defendant Murphy became the assistant warden in charge of the booking floor about March or April 2004. She began making announcements to supervisors and staff at roll call meetings that she was discontinuing the intake strip search policy. [JA1770-1802, see pp.1780-1781, 1790] Former lieutenant Coulter recalled a meeting of supervisors at which the commissioner, the warden, and assistant warden were present and announced the end of the blanket strip search practice, which happened after LaMont Flanagan left (after May 2003), and around the time of the Jednorski to Murphy transition in March-April 2004. [*Id*.]

In August 2004, Defendant Murphy became warden of Central Booking, including the booking floor. She issued new strip-search post orders for arrestees. [JA228-229; JA230-232] These post orders are ambiguous with respect to the strip-search policy. For example, the post order for the female search room nowhere addresses and, therefore, does not expressly prohibit, strip searches. [JA228-229] Most female search officers continued to strip search all incoming arrestees, as is discussed later. The post order for the male search room [JA230-232] states in ¶2: "If the search room officer suspects the offender is concealing contraband beneath the underwear, then a strip search will be conducted." This basically left it to the unguided discretion of the searching officer whether to conduct strip-searches.

19

### 3.     Practice Of Strip Searching All Arrestees

As explained below, the practice of strip searching male arrestees began to taper off in the summer of 2004, but the practice of strip searching female arrestees went on for several more years and only began to taper off in 2007-2008.

Plaintiffs deposed numerous searching officers both male and female, who worked in the search rooms. [JA3418-3546, see pp.3449-3470] During the depositions plaintiffs asked the searching officers whether the other officers they worked with in the search rooms also strip-searched arrestees. Plaintiffs then examined work records and identified the other searching officers who worked with the searching officers plaintiffs deposed. [*Id*. at p.3452,Table 1; p.3455, Table 2] It is clear from the depositions that the practice of strip-searching male arrestees continued from defendant Jednorski's tenure at least through about August 2004, and the practice of strip-searching female arrestees continued up through 2008. [*Id*. at pp.3418-3546]  It is equally clear that both wardens were aware of the strip-searches. [*Id*. at pp.3473-3484]

### 4.     Example of Strip Searches

While there was varying testimony regarding the scope of the searches conducted by booking floor personnel, Anthony Haig provided a class member description of the searches that conforms to the scope of the search called for by the Jednorski policy. Mr. Haig was arrested in Baltimore on April 17, 2005, for re-

20

selling tickets to a Baltimore Orioles baseball game, and taken to the BCBIC for booking. Upon entry, he was pat searched in the sallyport room. [JA1815-1826, see p.1818]  He was then taken to a search room and a BCBIC officer instructed Mr. Haig to remove all his clothes, which were checked individually. [*Id*.] He was instructed to raise his arms and run his fingers through his hair. [*Id*.] The search officer instructed Mr. Haig to lift his genitalia, then turn around and spread his buttocks. [*Id*. at pp.1818-1819]. This was done in view of another arrestee (who was also being searched) in addition to the search officer. [*Id*. at pp.1819-1829] No weapons, drugs, or illegal contraband were found on Mr. Haig. He was then taken to and handcuffed to a booking window. [*Id*. at 1825-1826] Mr. Haig was then taken to a holding cell to await presentment before a court commissioner, and released on personal recognizance on the same day of his arrest.

## ARGUMENT

## V. SUMMARY OF ARGUMENT.

The Defendants are former wardens and assistant wardens of the Baltimore Central Booking and Intake Center ("CBIC"). The District Court granted them qualified immunity based on the fact that *Florence v. Bd. of Chosen Freeholders*, 132 S.Ct. 1510 (April 2, 2012) found strip searches of those entering the "general population" constitutional. This case squarely presents the constitutionality of routine strip/visual body cavity searches of pre-presentment new arrestees, arrested

on minor charges, who are held in a completely separate area of the jail from the general population, after *Florence*.

The Court below concluded that *Florence,* although decided long after the events here, "left the contours of any 'exception' that would apply to the plaintiffs in this case unclear and open to debate." [JA4263-4272, see p.4271]  It thus granted Defendants qualified immunity on the ground that the law was not "clearly established" even though, when Defendants engaged in the conduct they did, the "'the right of those arrested for offenses not likely to involve weapons or contraband to be free from strip searches without any individualized finding of reasonable suspicion appear[ed] to be clearly established.'" *Jones v. Murphy*, 2013 WL 822372 (D.Md. Mar. 5, 2013), (quoting prior decision in 470 F.Supp.2d 537, 547 (D.Md.2007)) (referencing, *inter alia*, *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir.1981)).

The Court below thus violated a basic principle of qualified immunity law: that it is the law "at the time of the violation" that governs the clearly established prong of the analysis. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S. Ct. 3012, 3019 (1984); see also *e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004) ("reasonableness is judged against the backdrop of the law at the time of the conduct").

22

It is beyond dispute that the law in this circuit was clearly established in 2002-2005 that routine strip searches of new arrestees on minor charges who had not appeared before a judicial officer and were not being placed in the general population was unconstitutional. Thus, the sole appropriate inquiry was, in light of *Florence* and this Court's precedents, whether the strip searches at issue were constitutional, to which the correct answer (not addressed below) was "No."

*Florence* made clear that its inquiry was limited to entries to the general population, and even then, *Florence* did "not present the opportunity to consider a narrow exception of the sort Justice Alito describes, … which might restrict whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here." [*Id*. at 1523] (emphasis supplied).

Both Justices Alito and Roberts made clear that they had grave reservations about the constitutionality of such strip searches, and recognized that most such arrestees on minor charges were released before or at their first appearance, either outright or on bail or personal recognizance. The case here is even clearer because Plaintiffs were not placed in the general population, were held in a separate area without beds, were generally processed within hours, and most were released without ever being admitted to the general population (when they were again strip

23

searched). Because *Florence* solely addressed general population admittance, and Plaintiffs were not so admitted, this Court's prior precedent remains intact. See *Bull v. City and County of San Francisco*, 595 F.3d 964, 972 (9th Cir.2010) (*en banc*) (leaving intact prior circuit precedent finding routine strip searches of new arrestees on minor charges unconstitutional even though it permitted them for those classified for housing in the general population). Especially in light of the permissibility of arrests on the most minor of charges, *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the role of review by a judicial officer is critical, but totally ignored in the equation here. *Atwater* and numerous other cases recognize that the magistrate is a critical constraint on the unfettered power of the executive, and the *Florence* concurrences of Justices Alito and Roberts recognizes that the absence of judicial review, combined with the availability of non-general housing holding cells, gives great pause to the indiscriminate practice of strip searches. This Court should so conclude.

## VI. THE DISTRICT COURT ERRED IN CONCLUDING THAT DEFENDANTS HAD QUALIFIED IMMUNITY BECAUSE FEDERAL STRIP SEARCH LAW IS CURRENTLY "UNCLEAR."

### A. *THE COURT BELOW MADE ITS CLEARLY ESTABLISHED DETERMINATION BASED ON THE STATE OF THE LAW AT THE TIME OF THE RULING, NOT AT THE TIME OF THE CHALLENGED CONDUCT.*

The basis of the District Court's decision that the law was not clearly established was its conclusion that *Florence* created uncertainty, thereby

undermining the proposition that the law was clearly established. The Court's analysis was:

> ➢ When the Court had ruled on the motion to dismiss and class certification (2007 and 2009 respectively), the wardens did not "appear entitled to rely on qualified immunity" because, "[u]nder Fourth Circuit law, 'the right of those arrested for offenses not likely to involve weapons or contraband to be free from strip searches without any individualized finding of reasonable suspicion appears to be clearly established.'" (quoting its previous opinion, *Jones v. Murphy,* 470 F.Supp.2d 537, 547 (D.Md.2007).

> ➢ That determination rested on and cited this Court's decisions in *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981); *Amaechi v. West,* 237 F.3d 356, 365 (4th Cir.2001); and *Abshire v. Walls,* 830 F.2d 1277, 1279–80 (4th Cir.1987)).

> ➢ The "*recent decision* by the Supreme Court in *Florence,* however, established that it does not violate the Fourth Amendment to require a strip search of every arrestee who *will be admitted to the general population* of a jail regardless of the offense for which he is arrested and without the need for individualized suspicion that the arrestee may have contraband or weapons." (Emphasis supplied.)

25

➢ According to the District Court. *Florence* "not only overruled some aspects of Fourth Circuit law (on which this court previously relied in denying the motion to dismiss) but in doing so *left the contours of any 'exception' that would apply to the plaintiffs in this case unclear and open to debate*." (Emphasis supplied.)

➢ Thus, since *Florence*, there exists a "*present lack of a clear test* applicable to the specific circumstances of detention practices at CBIC during the years at issue in this litigation." (Emphasis supplied.)

[JA4263-4272, see, pp.4270-4272]; See *Jones v. Murphy*, 2013 WL 822372 (D.Md. Mar. 5, 2013)

Thus, according to the District Court, later uncertainty in the law renders irrelevant for the clearly established prong of the qualified immunity analysis the fact that the law was clearly established at the time of the conduct. The Court confused whether the law was clearly established **at the time of the conduct** with whether the law was clearly established **at the time of the decision**. Further, because *Florence* was carefully circumscribed, it did not, and did not purport to, address or affect the state of the law for those not entering the general population, which is what this case involves.[9] We now turn to those issues.

---

[9] The analysis of the District Court in *Munyiri v. Maynard*, CIV. CCB-08-1953, 2013 WL 1325223 (D. Md. Mar. 29, 2013), is similarly flawed. The Court agreed that Plaintiffs had not been presented to a judicial officer, were never admitted to

**B.    THE QUALIFIED IMMUNITY FRAMEWORK.**

In numerous cases, the Supreme Court and this Court have explained that the qualified immunity analysis has two components: 1) "whether the plaintiff has alleged the deprivation of an actual constitutional right at all" and 2) "whether that right was clearly established *at the time of the alleged violation*." *Wilson v. Layne*, 526 U.S. 603, 609, 119 S. Ct. 1692 (1999) (citation and quotation omitted) (emphasis supplied); *see also, e.g., Doe ex rel. Johnson v. S. Carolina Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009)) .

### 1.    Clearly Established Law Is Ordinarily Based On Supreme Court Or Circuit Precedent.

Whether the law was clearly established or not is based, first, on whether there are "any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely." *Wilson v. Layne*, 526 U.S. at 617. If there are not, then the question is whether there exists a

---

the general jail population, and were not charged with crimes involving weapons, drugs or violence (thereby falling squarely within *Logan's* prohibition). The Court also acknowledged that, "[u]ntil recently, the defendants did not appear entitled to rely on qualified immunity." Nonetheless, it found qualified immunity because "the Supreme Court's opinion in *Florence* …left the contours of any 'exception' that would apply to the plaintiffs in this case unclear and open to debate." However, the *Munyiri* Court, like the Court below, failed to address the fact that the clearly established prong is based on the law "at the time" of the conduct and that the conduct at issue occurred long before the 2012 decision in *Florence* when the law was clear (and Plaintiffs maintain still is).

"consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." [*Id.]*

If there is controlling Supreme Court or Circuit authority, there is ordinarily no qualified immunity; conversely, where there is no Supreme Court or Circuit authority, there will ordinarily be no qualified immunity even if the law was clearly established in other circuits. *See, e.g., Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir.2012), vacated on other grounds, ––– U.S. –––, 133 S.Ct. 9, 184 L.Ed.2d 313 (2012) ("we have long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established"); *id*. at 1998-1990 ("courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the cases arose. ... If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense."); *Doe v. South Carolina Department of Social Services*, 597 F.3d 163 (4th Cir. 2010) (rejecting qualified immunity because there was no controlling circuit authority even though a number of other circuits had found the conduct at issue violated the Constitution).

> **2.    Clearly Established Law Looks To The State Of The Law At The Time Of The Events.**

The clearly established law prong of qualified immunity looks to whether the law was clearly established "at the time" of the conduct at issue. *See, e.g.,*

28

*Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019 (1984) (Supreme Court cases have made clear that an official was not liable for "damages under §1983 unless the constitutional right he was alleged to have violated was 'clearly established' *at the time of the violation*"); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982) ("On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established *at the time an action occurred*. If the law at that time was not clearly established", the official is entitled to qualified immunity); *Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir.2013) ("a court ... must determine whether the right at issue was 'clearly established' *at the time of the officer's conduct*"). (Emphasis supplied in all cases.)

In *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004), the Supreme Court explained the policy considerations behind this standard:

> "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. … Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's

29

conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation."

Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815 (2009*); see also, e.g., Doe ex rel. Johnson v. S. Carolina Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010) (quoting *Pearson*). The "at the time" requirement furthers that balance by only holding accountable officials who were on notice of the unlawfulness of their conduct.

The rationale has been applied even when officers engaged in egregious conduct that was considered permissible under Circuit law but was at odds with, and based on an incorrect reading of, Supreme Court precedent. *See Hill v. Crum*, 727 F.3d 312 (4th Cir. 2013) (granting qualified immunity to prison guards who had engaged in excessive force in violation of the Eighth Amendment because Circuit law at the time of the incident misapplied Supreme Court precedent and provided that *de minimis* injury was insufficient to violate the Eighth Amendment).

The backdrop to *Hill* was the Supreme Court's overturning, in *Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1177-78 (2010), of this Court's construction of *Hudson v. McMillian*, 503 U.S. 1, 4, 112 S.Ct. 995 (1992). *Hudson* had

30

established that, "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. …whether or not significant injury is evident." *Hill*, 727 F.3d at 320. Nonetheless, this Circuit had interpreted *Hudson* very narrowly, requiring more than *de minimis* force (which could even be force, as it was in *Wilkins*, involving punching, kicking kneeing and choking an inmate).

   *Wilkins* concluded that Fourth Circuit law was based on a "strained reading" of *Hudson*; that *Hudson* had established that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury"; that, "[i]n requiring what amounts to a showing of significant injury in order to state an excessive force claim, the Fourth Circuit has strayed from the clear holding of this Court in *Hudson*"; and that the Fourth Circuit's interpretation of the law was "at odds with *Hudson's* direction to decide excessive force claims based on the nature of the force rather than the extent of the injury." *Hill*, 727 F.3d at 320.

   In *Hill*, although the guards conceded that their conduct was unconstitutional, and that the Fourth Circuit's pre-*Wilkins* standard was "at odds" with *Hudson*, the guards nonetheless were entitled to qualified immunity. This was so even though the "Supreme Court made clear in *Wilkins*" that Fourth Circuit precedent "was an incorrect reading of *Hudson*." 727 F.3d at 322 .Regardless, the

31

qualified immunity analysis required that "we evaluate whether the right at issue, for qualified immunity purposes, was clearly established at the time of Crum's conduct", [*id.*], and under Fourth Circuit precedent, the conduct was not considered unlawful at that time. [*Id.*] *Wilkins* could "only be applied prospectively in the context of a qualified immunity analysis…. The applicable law for qualified immunity purposes would be that in existence in 2007, the time of the alleged assault." [*Id.]*

Most of the cases applying "at the time of the violation" have arisen where, as in *Hill*, the law has developed in a way that benefits the Plaintiff, i.e., the law was unclear when the conduct occurred, but subsequent cases have made clear that the conduct violated the Plaintiff's constitutional rights. Because the focus of the qualified immunity inquiry is "fair notice," it would undermine the officer's ability to do his/her job if s/he were subject to liability post hoc. *Brosseau, supra*.

Although the common framework in which the issue of change in the law arises is where the change benefits the Plaintiff, the same analysis applies equally where the change has been in Defendant's favor. Because the "focus is … fair notice that …[the] conduct was unlawful," *Brosseau, supra*, if the law changed such that law that was previously established came into question only after the conduct, the officer had fair notice when the conduct occurred and cannot invoke the clearly established prong of the qualified immunity analysis. Of course, the

officer can argue that the other qualified immunity requirement – that the conduct was unconstitutional – is not met, but if it was unconstitutional, and the law at the time was clearly established to that effect, there is no qualified immunity.

Just as it would unfairly hold an officer responsible when the law changed in a way that would make his/her conduct unlawful when that was not clear before, so it would unfairly deprive a Plaintiff of his right to "hold public officials accountable" where there was in fact a constitutional violation; the law was clear at the time; and, to the extent the law came into question, it did so afterwards. In that situation, the policy objective of the qualified immunity standard would be met. The officer knew or was charged with the knowledge of the law at the time. This does not mean that the officer is automatically liable. It only means that, if the officer's conduct was in fact unconstitutional, s/he will not be able to unfairly invoke subsequent uncertainty when the law was certain at the time of the conduct, and the conduct was unconstitutional.

While Plaintiffs are unaware of many cases where the law was changed from clearly established in Plaintiffs' favor to becoming questionable in the context of qualified immunity, one case with similarities to this one where that is precisely what happened is *Powell v. Barrett*, 496 F.3d 1288 (11th Cir. 2007) on reh'g *en banc*, 541 F.3d 1298 (11th Cir. 2008). In that case, which pre-dated *Florence*, the Court was faced with three types of strip searches, all of which

33

involved placements in the general population: new arrestees on minor charges transferred to the general population and strip searched before seeing a judicial officer (AR Class); new arrestees who had appeared before a judicial officer and ordered released and then were transferred to the general population and strip searched as part of the booking process(AL Class); arrestees held in the general population pending final disposition of their charges who were taken to court and ordered released and then returned to general population and strip searched before being released(CR Class).

The original *Powell* Panel concluded that the strip search law for all three classes (AR, AL and CR) was clearly established under Eleventh Circuit precedent. For the AR class, prior Eleventh Circuit precedent made "clear that jailers are required to have reasonable suspicion of weapons, drugs, or other contraband before strip-searching arrestees bound for the general jail population." 496 F.3d at 1316. For the AL and CR classes, the "conduct challenged" for the two classes "was the same as the conduct" addressed in prior strip search cases because the "facts of the … AL and CR Groups" were "materially similar to the pertinent facts" in earlier precedent. "Although the "AL and CR Group Plaintiffs were not newly-admitted arrestees, [that] makes it even more obvious under [prior cases] that their strip searches were unconstitutional."

That conclusion was reached in the face of Defendants' argument that *dicta* in *Evans v. Stephens*, 407 F.3d 1272, 278 (11th Cir.2005) (*en banc*), had called into question the correctness of the Circuit's strip search law. The panel explicitly rejected the proposition that changes in the law that post-dated the conduct would affect the clearly established inquiry because, "even if our *dicta* in *Evans II* and *Hicks* could be said to 'muddle' the law of this Circuit, the opinions in both cases were issued *after* the alleged strip searches in the instant case occurred and thus could not have affected Sheriff Barrett." 496 F.3d at 1317 (11th Cir. 2007) (original emphasis).

The *en banc* Court concurred that the law at the time was clearly established, and that that disposed of the clearly established inquiry, stating that, "[d]espite its misgivings, the panel acted properly in following *Wilson* because it was bound by the prior panel precedent rule to do so", but that the *en banc* Court was free to reconsider the correct constitutional standard. 541 F.3d at 1301. The fact that subsequent case law may have called the unconstitutionality of the conduct into question did not alter that the law was clearly established at the time of the conduct at issue. It instead meant that the proper inquiry was whether the conduct was or was not constitutional. That is similarly the proper inquiry here.

Because, as we explained above in Argument 2, the law is clearly established where there is controlling precedent on point from either the Supreme

35

Court or the Circuit, the clearly established inquiry in this case is whether, from 2002 to 2005, the law was clearly established in this Circuit that a strip search of a person arrested on a minor charge not involving drugs or violence, who has not yet appeared before a judicial officer and who has not been placed in the general population, may be subjected to a strip search.[10]

### C. THE LAW WAS CLEARLY ESTABLISHED IN THIS CIRCUIT DURING THE RELEVANT PERIOD THAT STRIP SEARCHES OF NEW ARRESTEES ON MINOR CHARGES NOT PLACED IN THE GENERAL POPULATION WERE UNCONSTITUTIONAL.

The law in this Circuit was clearly established during the 2002-2005 class period in this case that the blanket strip searches of pre-presentment arrestees on minor charges not placed in the general population violates the Fourth Amendment. *Logan v. Shealey*, 660 F.2d 1007 (4th Cir. 1981). In *Logan*, which was the first post-*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861 (1979), strip search case decided by a Circuit Court of Appeals, this Court held that the strip search of a pre-appearance arrestee on a minor charge not entering the general population was unconstitutional. In *Logan*, the plaintiff was a young woman who had been detained in a holding cell of a county jail (outside of the general population

---

[10] *See also T.S. v. Gabbard*, 2012 WL 2175791 at 9, (E.D.Ky. Jun 14, 2012) ("*Florence* is irrelevant to the Court's analysis of the Plaintiff's individual capacity claims for money damages, because the Court must consider the law at the time the Defendants conducted the strip search, which occurred well before the Supreme Court's decision in *Florence*.")

36

housing units), waiting for someone to post bail. *Logan* made unequivocally clear that the searches at issue in the instant case were unconstitutional:

> "On the undisputed and stipulated evidence, Logan's strip search bore no … discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified. At no time would Logan or similar detainees be intermingled with the general jail population; her offense, though not a minor traffic offense, was nevertheless one not commonly associated by its very nature with the possession of weapons or contraband; there was no cause in her specific case to believe that she might possess either; and when strip-searched, she had been at the Detention Center for one and one-half hours without even a pat-down search. An indiscriminate strip search policy routinely applied to detainees such as Logan along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations." 660 F.2d at 1013.[11]

---

[11] The two other strip search cases from this Circuit are less directly related to the issues here; both were focused in large part on the privacy of the search. *See Amaechi v. West.*, 237 F.3d 356, 359 (4th Cir. 2001) (strip search conducted on the street in front of police cruiser, making it possible for the other police officers, neighbors, and family members to observe was unlawful; "we have repeatedly emphasized the necessity of conducting a strip search in private"); *Abshire v. Walls*, 830 F.2d 1277, 1280 (4th Cir. 1987) (jury question whether search was constitutional where strip search conducted after weapon had been confiscated, no pat-down search was conducted, and search was conducted in front of six to eight

The *Logan* court based its holding on what it identified as "[o]ne of the critical, and certainly most obvious, elements in the *Bell v. Wolfish* balancing inquiry into the reasonableness of a strip search [i.e.] 'the place in which it is conducted.'" [*Id* at 1014]

While Defendants contest Plaintiffs' facts, it is black letter law that Plaintiffs' version of the facts must be accepted as true in a summary judgment motion. *See, e.g., Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 275 (4th Cir. 1995). That version is that, at least until Defendant Murphy became warden in about August 2004, the commissioner and wardens of Central Booking had both a policy and practice of subjecting all arrestees admitted to the booking floor of Central Booking to blanket strip searches; that the practice continued until recently and the wardens knew or should have known; that there was no justification for the strip searches; and that the booking floor of Central Booking is not a general population area and does not present the same security issues as a general population facility.

It does not appear that this Court has addressed *Florence v. Board of Chosen Freeholders*, 132 S.Ct. 1510 (2012), except to note, in an unrelated case, the Court's holding "that strip searches of any and all arrestees housed in general population of local detention centers and jails are constitutionally permissible." *Bennett v. R & L Carriers*, 2012 WL 2354633, p.21 (4th Cir. June 21, 2012). That

police officers-- five who were in the room with him and several others, including a female officer, who witnessed the search while standing in the adjacent hallway).

description of *Florence* plainly means that *Florence* did not address the non-general population issue, and therefore has no impact on the continuing effect of *Logan* as binding circuit precedent.[12]

Until Defendants read *Florence* and recent circuit court cases (*Powell* and *Bull*), they denied there was a policy to do such searches and, as we explained in the Statement of Facts, conceded that there was no security reason for them. Based on these assertions and concessions, any strip search practices were not the result of any alleged security/general population equivalency argument, but simply because the search officers arbitrarily searched incoming arrestees contrary to Defendants' claimed policy. Such a post-hoc rationale does not support reliance on *Florence*. *See Cianfaglione v. Rogers*, 2012 WL 1659141, Fn.12, (C.D.Ill. May 11, 2012) (noting that "*Florence* is not applicable to this case because Defendants concede that the sole justification for ordering the strip search was the suspicion that Plaintiff was concealing contraband on her person", not entry into the inmate population).

---

[12] Under the Prior Panel Rule, *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (*en banc*), *Logan* remains the law in this Circuit unless and until it is overruled by the Circuit sitting *en banc* or by the Supreme Court. Therefore, the argument that other Circuits have reached a contrary position does not affect the clearly established law in this case.

**D.    THE SUPREME COURT'S DECISION IN FLORENCE WAS EXPRESSLY LIMITED TO THOSE ENTERING THE "GENERAL POPULATION" AND DID NOT AFFECT THE CONTROLLING EFFECT OF LOGAN.**

In the *Florence* majority opinion, Justice Kennedy was very clear that the "controversy [before the Court] concerns whether *every detainee who will be admitted to the general population* may be required to undergo a close visual inspection while undressed." *Florence*, 132 S.Ct. at 1513 (emphasis supplied). Indeed, the opinion, as well as Justice Alito's and Roberts' concurrences, made clear that it was not even addressing all entries into the general population. Justice Kennedy was careful to explain that *Florence* did

"not present the opportunity to consider a narrow exception of the sort Justice Alito describes, ... which might restrict whether an arrestee *whose detention has not yet been reviewed by a magistrate or other judicial officer*, and *who can be held in available facilities removed from the general population*, may be subjected to the types of searches at issue here." [*Id.* at 1523] (emphasis supplied).

We highlight this last statement because it makes clear that *Florence* is inapplicable to the present case. Since *Florence* did not affect the pre-existing law in this Circuit, *Logan* remains the law in this Circuit unless and until this Court *en banc* (due to the prior panel rule), or the Supreme Court, concludes that pre-

40

presentment, non-general population strip searches are constitutional.[13] As we explain in the next section, *Logan* is the correct constitutional analysis, and a majority of the Supreme Court in *Florence* was of that view.

### E. *LOGAN IS CORRECT AND IS SUPPORTED BY A CLOSE READING OF FLORENCE.*

As we have explained above, *Florence* did not purport to address, much less hold, that routine non-general population strip searches for minor charges are constitutional. Relying on the framework of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254 (1987), the Court concluded that, on the record before it, the strip searches of new arrestees being admitted to general population were "reasonably related to legitimate penological interests." 132 S.Ct. at 1513.

Justice Alito recognized in his concurrence that "[u]ndergoing such an inspection is undoubtedly humiliating and deeply offensive to many." 132 S.Ct. at 1524. This statement reflects a well-established judicial consensus. Strip and visual body cavity searching entails one of the most humiliating and degrading practices available to law enforcement. *See, e.g., Bell v. Wolfish,* 441 U.S. at 576-77, 594, 99 S.Ct. at 1893-94, 1903 (Marshall, J., dissenting) ("body cavity searches ··· represent one of the most grievous offenses against personal dignity and common

---

[13] This case presents neither the need nor the opportunity to address whether the law would be considered clearly established if the alleged conduct occurred post-*Florence*. Since it pre-dated *Florence*, there is not a clearly established issue for the reasons previously discussed.

decency"); [*Id*., 441 U.S. at 558] ("this practice[of strip searches] instinctively gives us the most pause"); *Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364, 374-75, 129 S.Ct. 2633, 2641(2009) (describing the strip searches there as "embarrassing, frightening, and humiliating"); *Amaechi v. West.,* 237 F.3d 356, 364 (4th Cir. 2001) ("this Court has recognized the fact, first established in *Bell*, that the intrusive, highly degrading nature of a strip search demands a reason for conducting such a search that counterbalances the invasion of personal rights that such a search involves"); *Blackburn v. Snow,* 771 F.2d 556, 564 (1st Cir. 1985) ("body cavity searches are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.'" quoting *Marybeth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983)); *Doe v. Renfrow,* 631 F.2d 91, 93 (7th Cir.1980) (*per curiam*) (strip search of a minor student absent reasonable cause violates "any known principle of human decency" and "exceed[s] the 'bounds of reason' by two and a half country miles."); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982) ("a strip search, regardless of how professionally and courteously conducted, is an embarrassing and humiliating experience," involving an "extensive intrusion on personal privacy"); *Kennedy v. Los Angeles Police Dep't.,* 901 F.2d 702, 711 (9th Cir.1990)

("[s]trip searches involving the visual exploration of body cavities are dehumanizing and humiliating").[14]

Justice Alito's *Florence* concurrence, cited favorably by Justice Roberts' concurrence, emphasized that both review by a judicial officer and the feasibility of holding the detainee in available facilities removed from general population are critical aspects of the analysis. Justice Alito joined the opinion of the Court solely because it explicitly contained this limitation, [*Id.* at 1524] ("In light of that limitation, I join the opinion of the Court in full"), and strongly suggested that the circumstances above would yield a different result:

"[T]he Court does not hold that it is *always* [original emphasis] reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population. *Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate. In some cases, the charges are dropped. In others, arrestees are released either on their own*

---

[14] The fundamental and instinctive interest in the privacy of the naked body has its roots in scripture and has been recognized in literature for millennia. The first emotion Adam and Eve felt after being expelled from Paradise was shame in their nakedness, leading them to hide themselves. In Dante's Inferno, nakedness is the badge of souls condemned to Hell without hope. Virtuous pagans and others held before the Gates of Hell remain clothed, but evildoers cast beyond the gates in the general population of Hell go naked and humiliated. Dante Alighieri, Inferno, Canto III.

*recognizance or on minimal bail. In the end, few are sentenced to incarceration. For these persons, admission to the general jail population, with the concomitant humiliation of a strip search, may not be reasonable, particularly if an alternative procedure is feasible.*" *[Id].* (latter emphasis supplied).

Justice Roberts also made clear that the necessity of placement in the general population was a critical consideration. [*Id.* at 1523] ("*it is important for me that* … Florence was detained not for a minor traffic offense but instead pursuant to a warrant for his arrest, and that *there was apparently no alternative, if Florence were to be detained, to holding him in the general jail population*.") [*Id.* at 1523] (emphasis supplied).[15]

Given the emphasis of both Justices Alito and Roberts on the necessity of placement in the general population to justify a strip search, the only logical reading of their concurrences is that pre-appearance, pre-general population strip searches on minor charges are unconstitutional. It is difficult to reasonably read their concurrences any other way. *See also* [*id.* at 1531] (Breyer, J., dissenting) (Justice Breyer "share[s] Justice Alito's intuition that the calculus may be different… where a person has not yet been presented to a judicial officer" and a

---

[15] Warrant arrestees are exempt from the 48 hour presentment rule of *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (U.S. 1991) because the probable cause determination underlying their arrests have already been judicially reviewed. *See Gerstein v. Pugh*, 420 U.S. 103, 120-122 (U.S. 1975).

jail admits those charged with minor offenses into "the dangerous world of the general jail population and subjecting [them] to a strip search").

It is appropriate to consider the likely view of a majority of justices on these issues, even if not binding. *Cf., e.g., League of United Latin Am. Citizens v. Perry,* 548 U.S. 399, 126 S.Ct. 2594, 2607 (2006) (citing concurring and dissenting opinions to establish majority support for legal proposition); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 17, 103 S.Ct. 927, 937 (1983) (finding that four dissenting Justices and concurring Justice formed majority to reaffirm controlling legal standard); *Waters v. Churchill,* 511 U.S. 661, 685-86, 114 S.Ct. 1878, 1893 (1994) (Souter, J., concurring) (analyzing plurality, concurring, and dissenting opinions to identify legal test to be applied by lower courts); *Alexander v. Sandoval,* 532 U.S. 275, 281-82, 121 S.Ct. 1511, 1517 (2001) (noting agreement between Justice who joined plurality and four dissenters).

In light of the express limitation in Justice Kennedy's opinion, the concurrences, and the four dissenting votes, six members of the Court, and possibly more, would likely find that strip searches of the type at issue here are unconstitutional. As the Statement of Facts explains, the strip searches here were highly intrusive visual body cavity searches; were conducted on new arrestees held in a pre-presentation holding floor that was walled off from the housing area, had no beds and was devoted exclusively to short-term new arrestees; inmates were

presented to a court or released within 24 hours; and there was no intermingling between the general population and the new arrestees.

One District Court in this Circuit reached that very conclusion on a motion to dismiss (although it reached a different conclusion, based on undisputed facts, in a later motion for summary judgment). In *Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*, 2013 WL 2389447 (S.D.W.Va. May 30, 2013), the District Court concluded precisely the reading of *Florence* urged here. After observing that this Court had decided "long ago" that an indiscriminate strip search policy of those who were "not intermingled into the general population, who did not commit an offense commonly associated with possession of a weapon or contraband, who gave no reason to believe she possessed a weapon or contraband, and who was detained for a short amount of time prior to release" was unconstitutional, the Court explained that *Florence* had clearly reserved the issue of the constitutionality of such strip searches. Since "*Florence* did not overrule the Fourth Circuit's decision in *Logan* in this regard, it remains clearly established within the Fourth Circuit that such searches are unconstitutional. Assuming these limited facts, the decision in *Florence* does nothing to change the legal landscape in the Fourth Circuit," Defendants were not entitled to qualified immunity.[16] [17]

---

[16] The motion to dismiss opinion applied *Logan* in the same manner that pre-*Florence* courts had. *See Smith v. Montgomery County*, 547 F.Supp. 592, 593–95 (D.Md.1982) and related cases (class preliminary injunction for female plaintiff

Such an interpretation of *Florence* is strongly supported by the broad arrest power recognized in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), which was cited in *Florence*. Whatever approach would be reasonable in a regime where only serious crimes could lead to warrantless arrests, that is not the rule adopted in *Atwater*, which held that a person may be arrested for any offense, even if punishable only by a fine, when it is committed in the presence of an officer. 532 U.S. at 323. Indeed, in *Florence*, the Court appeared concerned that a per se rule allowing strip searches would lead to troubling results in light of *Atwater*. Atwater had been arrested for fine-only offenses and was held outside the general population until her initial hearing, when she posted bond and was released. *See id.* While explaining that *Florence* did not condone strip searches of people arrested for minor offenses who could be held outside general population, Justice Kennedy

---

arrested on contempt for failure to appear for a child support action, taken to police station and then to the Montgomery County Detention Center, where she remained overnight and was strip searched without privacy pursuant to policy).

[17] In its summary judgment opinion, 2013 WL 5531855 (S.D.W.Va. Oct. 4, 2013), the Court concluded that defendants were entitled to summary judgment. It did not explain or address why it reached a different conclusion than it did in the motion to dismiss, or address its reasoning in that earlier opinion, which we believe was correct. In Fn.16, it distinguished *Logan* because "the detainee [in *Logan*] was not intermingled with the general inmate population, she was at the facility for only one and one-half hours and her release was impending, and she was not subject to a pat down search before being strip searched." Here, the detainees were not intermingled with the general population and were subject to pat down searches, thus bringing them squarely within *Logan's* reach, as well as the reasoning of the *Florence* concurrences.

47

pointedly noted this "describe[d] the circumstances in *Atwater*." 132 S.Ct. at 1523.

The Chief Justice emphasized that, unlike Atwater, "Florence was detained not for

a minor traffic offense but instead pursuant to a warrant," and "there was

apparently no alternative … to holding him in the general jail population." [*Id*.]

And Justice Alito suggested that a strip search following a warrantless arrest for a

minor offense "may not be reasonable," noting favorably that the federal

government "segregates temporary detainees who are minor offenders from the

general population." [*Id*. at 1524]. That is precisely what occurs here.

When viewed in light of *Atwater*, constitutionally permitting the strip

searches below would allow virtually any ordinary citizen to be arrested and strip

searched, without meaningful protection from a neutral magistrate. In *Atwater*, the

Supreme Court could adopt a bright-line and easily administrable rule for officers

on the street because, on the back end, a neutral and detached magistrate provided

vital case-by-case protection against police overreach. While "an officer on the

street might not be able to tell" whether an offense is jailable or punishable only by

a fine, "anyone arrested for a crime without formal process, whether for felony or

misdemeanor, is entitled to a magistrate's review of probable cause within 48

hours …." *Atwater,* 532 U.S. at 348, 352; *see County of Riverside v. McLaughlin*,

500 U.S. 44, 56 (1991). And the Court had "no reason to think" that a magistrate

will not promptly order a person released if there is no legal basis for holding him

or her. *Atwater*, 532 U.S. at 352. Of course, if they are released only after a strip search, the magistrate's role is cold comfort indeed.

*Atwater* is consistent with other Supreme Court cases emphasizing the magistrate's role in checking executive overreach. The magistrate provides "one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Johnson v. United States*, 333 U.S. 10, 16 (1948*); see also, e.g., Gerstein v. Pugh*, 420 U.S. 103, 114–16 (1975) ("When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty."). And as *Atwater* recognizes, independent review is particularly important for minor offenses that are frequently dismissed and rarely lead to a sentence of incarceration. *See also, e.g., Florence*, 132 S.Ct. at 1524 (Alito, J., concurring). That is, of course, precisely the situation we have here, where most of the arrestees are not transferred to the general population.

Eviscerating the magistrate's role would expose vast swaths of the population to a risk of a grave deprivation of personal privacy and individual dignity. Under *Atwater*, millions of ordinary American citizens are subject to arrest virtually any day for commonplace offenses like speeding, jaywalking, failing to wear a seatbelt, improper honking, distracted driving, failing to signal a turn, or

49

illegal parking. And more could be arrested under a vast and arcane web of federal, state, and municipal laws and regulations. Overall, more than 13 million people are arrested each year. *Florence,* 132 S.Ct. at 1515. Nearly a third of Americans are arrested by age 23. Erica Goode, "Many in U.S. Are Arrested by Age 23, Study Finds", N.Y. Times, Dec. 19, 2011 (citing National Longitudinal Study of Youth 1997). In 2002, 16.8 million Americans were stopped for traffic infractions. Bureau of Justice Statistics, Characteristics of Drivers Stopped by Police, 2002 at 1. Hundreds of thousands of people who are stopped will be arrested. E.g., Bureau of Justice Statistics, Contacts between Police and the Public, 2008 at 11 (Oct. 2011) (454,000 arrests in 2008).

On any given day, millions of ordinary citizens could be subject to arrest without a warrant for minor and ubiquitous offenses. A neutral magistrate plays a vital and necessary role in limiting this risk. At the initial hearing, a magistrate can ensure that detention for a fine-only offense stops immediately. *Atwater, 532 U.S. at 348, 352*. And the more nuanced rule embraced in *Florence* relies on the intervening role of a neutral magistrate. 132 S.Ct. at 1522–23. An interpretation of *Florence* that allows routine strip searches before any judicial review would eviscerate this protection, leaving arrestees on the most minor of charges, many of whom will be immediately released, to the executive's unfettered discretion about whom to arrest and whom to put into general population. See [*id*. at 1524] (Alito,

50

J., concurring) ("Most of those arrested for minor offenses are not dangerous, and most are released from custody prior to or at the time of their initial appearance before a magistrate.").

Both *Florence* and *Bell v. Wolfish*, 441 U.S. 520 (1979) recognize that one of the factors in the balance of determining the reasonableness of a strip search is "the scope of the particular intrusion" (along with the manner and place of, and justification for, the search). *Bell*, 461 U.S. at 559. The intrusion here is extraordinary. Similar to *Florence*, the searches in this case involve having all incoming arrestees, regardless of charge, remove and/or pull down clothing to allow visual inspection of bare genital, buttock, and breast areas. (Flanagan Dec. and Deposition.) "Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many ...." *Florence,* 132 S.Ct. at 1524 (Alito, J., concurring). The "meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions." *Safford Unified Sch. Dist. #1 v. Redding,* 557 U.S. 364, 377 (2009).

Moreover, this case involves greater privacy interests than *Florence* or *Bell*, which involved men whose detentions had been approved by a neutral magistrate and who were headed to the general population. *See Florence*, 132 S.Ct. at 1522–23; *Bell*, 441 U.S. at 523. By contrast, Plaintiffs here were on the cusp of the

criminal process. They had just been arrested for non-violent and non-drug-related offenses without review by a magistrate, and were not charged with crimes that justify such an intrusive search without more. The booking floor where they were held was "temporary, not for long", without beds, and without commingling with the general population. In fact, the former security chief of Central Booking conceded that the arrestees "are not on the booking floor that long to really have a security issue. . . ." Most are released directly from the booking floor and never go to the housing floors of Central Booking. While a jail has a powerful interest in keeping contraband out of general population, this jail had no valid justification for subjecting Plaintiffs not even being placed in the general population (unlike in *Florence* or *Bell*) to the indignity of a strip search. Plaintiffs had every reason to expect that their intimate privacy would be respected and that they would be treated like the ordinary citizens they were.

A conclusion that *Florence* changed the *Logan* rule would conflict with much of the Supreme Court's Fourth Amendment jurisprudence. For example, under *Missouri v. McNeely*, 133 S.Ct. 1552 (2013), a drunk driver who is arrested cannot, without more, be given an alcohol blood test. [*Id.* at 1556] Blood tests "ha[ve] become routine in our everyday life," *Schmerber v. California*, 384 U.S. 757, 771 n.13 (1966), and there will always be reasonable suspicion to believe they will detect evidence of a crime, but the Supreme Court stressed "the importance of

requiring authorization by a neutral and detached magistrate" before allowing such an intrusive search. 133 S.Ct. at 1558. Indeed, *McNeely* warned against adopting "an overly broad categorical approach … in a context where significant privacy interests are at stake." [*Id.* at 1564] Similarly, a school cannot search under a student's underwear when it reasonably suspects that she has forbidden prescription and over-the-counter drugs at school but lacks reasonable suspicion she was hiding them in her underwear. *Safford*, 557 U.S. at 368. Yet, if the searches here are constitutional, police who share the same suspicions could arrest the same student, take her downtown, strip her naked in front of a large group, and visually search her body cavities.

Finding the searches below constitutional would also make little sense in light of *Maryland v. King*, 133 S.Ct. 1958 (2013). *King* divided the Supreme Court 5–4 on whether the extraordinary advances of DNA technology outweighed the "minimal intrusion" of taking a cheek swab from every arrestee." [*Id.* at 1979] But the searches here involve a far greater invasion of privacy on an equally blanket basis to serve weaker government interests. Indeed, the dissent's concerns in *King* apply with particular force here. The *King* dissenters objected that by searching all arrestees (rather than all convicts), the state's blanket DNA-testing rule would certainly search people who would ultimately be acquitted or released. [*Id.* at 1989] (Scalia, J., dissenting). Searching arrestees "manages to burden uniquely the

sole group for whom the Fourth Amendment's protections ought to be most

jealously guarded: people who are innocent of the State's accusations." [*Id.*] Here,

the invasion of privacy is much greater—this is a strip search, not a cheek swab.

And the policy here burdens the innocent in precisely the same way. By choosing

to strip search all arrestees, before initial hearing and without placement in the

general population, the Defendants guaranteed that the jail would strip search

people whose detention is unlawful and who are ultimately innocent.[18]

---

[18] Several federal courts have similarly interpreted *Florence* to embrace an
exception for arrestees of the type at issue here. *See, e.g., Holland v. City of San
Francisco*, C10-2603 TEH, 2013 WL 968295 (N.D.Cal. Mar. 12, 2013) (the
"Parties agree that *Florence* leaves undisturbed … Ninth Circuit precedent holding
that strip searches of detainees charged with minor offenses who are not classified
for housing in the general jail population are unlawful" absent reasonable suspicion
unless the officer directing the search has a reasonable, individualized suspicion
that the detainee is carrying or concealing contraband (citing *Edgerly v. City &
Cnty. of San Francisco*, 599 F.3d 946, 957 (9th Cir. 2010) (which recognized that
*Bull v. City and County of San Francisco*, 595 F.3d 964, 972 (9th Cir.2010) "left
undisturbed our line of precedent requiring reasonable suspicion to strip search
arrestees charged with minor offenses who are not classified for housing in the
general jail population"); *Allen v. Union County, et al.*, 2:08–cv–00711–KSH–
CLW [Doc. No. 96] (D. New Jersey, Feb. 26, 2013) (concluding that *Florence*
does "not endorse a blanket rule that all persons may be strip searched after they
are arrested" and finding that "plaintiff's allegation is articulated to fall within the
ambit of an exception to the blanket strip search policy that the Supreme Court
identified" in *Florence*); *Ellsworth v. Wachtel*, No. 1:11–CV–0381, 2013 WL
140342, at *5 (N.D.N.Y. Jan.11, 2013) (observing that "[t]he Majority in *Florence*
(along with both Concurrences and the Dissent) emphasized that this was a narrow
holding and that the rule announced therein might not apply to arrestees who were
not going to be introduced to the general jail or prison population" and finding that
*Florence* did not govern the strip search at issue because the plaintiff was not
searched prior to her introduction into a general jail population, thus bringing the
search with the exception); *Haas v. Burlington Cnty.*, *supra* ("Whatever the

## VII. CONCLUSION.

For the reasons stated above, this Court should reverse the District Court's grant of summary judgment on qualified immunity grounds, and remand the matter to the District Court for further proceedings.

DATED: December 9, 2013          Respectfully Submitted,

KAYE, MCLANE, BEDNARSKI & LITT, LLP
LAW OFFICES OF WILLIAM C. CLAIBORNE
LAW OFFICES OF SEAN DAY


By___/s/ Barrett S. Litt_____
Barrett S. Litt
Attorneys for Plaintiffs/Appellants

---

contours and meaning of Justice Alito's concurrence may be", Plaintiffs' contention that "they either were held, or could have been held, outside the general population" brings them outside of *Florence*); *Flonder v. Sheriff of Kankakee County,* No. 12–2115, 2012 WL 4321714, at *6 (C.D.Ill. Aug.31, 2012) (the "Supreme Court expressly reserved the issue of whether its holding in *Florence* may be applied in circumstances" where plaintiff was "detained after a warrantless arrest, and had not had an initial appearance prior to being strip searched").

Plaintiffs recognize that there are district courts that have gone the other way, and point to the above decisions as examples of what they consider the correct analysis

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _____          Caption: _____

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ ]    this brief contains _____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s)_____

Attorney for_____

Dated:_____

# CERTIFICATE OF SERVICE

I certify that on <u>12/9/2013</u>            the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

<u>/s/ Barrett S. Litt</u>

Signature

<u>December 9, 2013</u>

Date